UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

SIMEON NAEMIT,

                    Plaintiff,

          -against-

THE VILLAGE OF SPRING VALLEY,

                    Defendant.

------------------------------------------------------------X

**OPINION AND ORDER**

20 Civ. 1882 (JCM)

      Plaintiff Simeon Naemit ("Plaintiff") commenced this action pursuant to Title VII of the

Civil Rights Act of 1964 (42 U.S.C. § 2000(e)), alleging that Defendant Village of Spring Valley

(the "Village" or "Defendant") retaliated against him for complaining of discrimination. (Docket

No. 1).  Presently before this Court is Defendant's motion for summary judgment pursuant to

Rule 56 of the Federal Rules of Civil Procedure.[1] (Docket No. 27).  Plaintiff opposed the motion,

(Docket No. 31), and Defendant replied, (Docket No. 36).  For the reasons that follow,

Defendant's motion is granted.

## I.  BACKGROUND

      The following facts are gathered from each party's statement filed pursuant to Rule 56.1

of the Local Rules of the United States District Courts for the Southern and Eastern Districts of

New York ("Rule 56.1"),[2] each party's supporting affidavits and exhibits, and the pleadings

submitted by the parties in support of their contentions.

---

[1] The parties consented to jurisdiction by a United States Magistrate Judge for all purposes pursuant to 28 U.S.C. § 636(c). (Docket No. 19).

[2] Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence and denied by only a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court deems such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed admitted for purposes of the motion unless specifically controverted . . ."); S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[ ] must be followed by citation

**A.  Plaintiff's Employment for the Village**

Plaintiff was hired as a part-time court officer[3] for the Village Justice Court ("Village

Court") in 2010. (Docket Nos. 30 ¶ 2; 33 ¶ 2).  As this role was a "non-competitive" civil service

position as defined by the New York Civil Service Law ("Civil Service Law"), to get hired,

Plaintiff was required to sit for an interview and submit various documents to demonstrate that

he met the position's minimum qualifications and to obtain certification from the Rockland

County Department of Personnel ("RCDP"). (*See* Docket Nos. 28-3 at 21:6-25; 28-4 at 17:10-

18:25).[4]  Moreover, pursuant to Rockland County Civil Service Rules, as a part-time employee,

Plaintiff's hours were limited to seventeen hours per week.[5] (Docket Nos. 33 ¶¶ 3-4; 28-4 at

24:13-19).  During Plaintiff's tenure as a court officer, he became friends with Alan Simon, then

a sitting justice in the Village Justice Court. (Docket Nos. 30 ¶¶ 5-6; 33 ¶¶ 5-6).

In 2018, Alan Simon ("Mayor Simon") became Mayor of Spring Valley. (Docket Nos. 30

¶ 7; 33 ¶ 7; 28-5 at 13:4-8).  According to Mayor Simon, around the time he took office, Plaintiff

approached him and expressed his desire for full-time employment with benefits. (Docket Nos.

30 ¶ 7; 33 ¶ 7).  Simultaneously, based on discussions with various employees, Mayor Simon

determined that Village Hall required additional security. (Docket No. 28-5 at 18:12-20:7, 23:18-

24:22).  Therefore, Mayor Simon consulted with Village counsel and the Village's Board of

---

to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").  In addition, Plaintiff's Response denies certain statements, but does not identify any actual factual inconsistency.  Where these counterstatements do not identify a true factual dispute, the Court treats the statement as undisputed. *See Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 408 n.1 (S.D.N.Y. 2017).

[3] The papers and deposition testimony use the titles "court officer" and "court attendant" interchangeably to describe this position. (*E.g.*, Docket Nos. 28-3 at 75:24; 33 ¶ 16).  For ease of reference, the Court uses "court officer" except when citing records that use "court attendant."

[4] All page number citations refer to the page number assigned upon electronic filing.

[5] However, Mayor Alan Simon ("Mayor Simon") testified that part-time employees could work seventeen-and-a-half hours per week. (Docket No. 28-5 at 30:16-23).

Trustees (the "Board"), and sought the Board's approval for Plaintiff to perform "security duties within Village Hall" in addition to his current appointment.[6] (*Id.* at 18:4-25:20, 37:21-38:21). Thereafter, Mayor Simon offered Plaintiff as well as Victor Reyes ("Reyes"), another court officer, part-time assignments as "court officer[s] upstairs," *i.e.*, "guard[ing]" Mayor Simon's "offices," (hereinafter the "Security Role"). (Docket No. 28-3 at 60:18-62:12, 70:3-9).

Plaintiff and Mayor Simon negotiated an arrangement whereby Plaintiff performed security at Village Hall on Mondays and Tuesdays, and spent the rest of the week as a court officer in Village Court. (Docket Nos. 30 ¶¶ 13-14; 33 ¶¶ 13-14; *see also* Docket Nos. 28-3 at 73:20-75:4; 28-5 at 27:2-25). Plaintiff testified that they also discussed the Security Role in a brief meeting with Dominick D'Alisera ("D'Alisera"), Plaintiff's union president, as well as the Village Clerk. (Docket No. 28-3 at 64:2-69:10). The parties dispute whether Plaintiff worked seven or seven-and-a-half hour days in the Security Role, but do not dispute that these hours supplemented the time he spent on his court officer duties. (*Compare* Docket No. 30 ¶ 14, *with* Docket No. 33 ¶ 14). According to Plaintiff's time cards, Plaintiff worked over seventeen-and-a-half hours on five occasions between July 2, 2018 and the Security Role's discontinuance on December 11, 2018. (Docket No. 32-5 at 2-3; *see also* Docket No. 33 ¶¶ 62, 72-73).

**B.  The Sexual Harassment Complaint**

Before Plaintiff assumed the Security Role, he also asked Mayor Simon if there were any job openings available for his daughter-in-law, Meagan Izquierdo ("Izquierdo"). (Docket Nos. 30 ¶ 18; 33 ¶ 18; *see also* Docket No. 28-3 at 118:3-6). Thereafter, the Village hired Izquierdo as a clerk in its Section 8 Office. (Docket Nos. 30 ¶ 19; 33 ¶ 19).

---

[6] Although Mayor Simon believed Plaintiff was qualified to perform these additional duties, he could not recall whether the Board formally approved this role, and Defendant did not produce any records reflecting that it did so. (*Id.* at 21:6-11, 38:1-40:4; *see also* Docket No. 33 ¶ 11). Plaintiff testified that according to Mayor Simon and multiple Trustees, the Board voted to approve this additional role. (Docket No. 28-3 at 32:5-16).

On December 7, 2018, when making "rounds" in his security capacity, Plaintiff saw a Section 8 employee named Justin Montgomery ("Montgomery") leaning over Izquierdo's desk in the Section 8 Office.[7] (Docket Nos. 30 ¶ 20; 28-5 at 68:23-69:3; 33 ¶ 20; *see also* Docket No. 1 ¶ 17). Plaintiff observed Montgomery speaking to Izquierdo, but did not hear what he said. (Docket No. 28-3 at 119:25-120:10). Plaintiff returned to his chair in Village Hall, and sometime thereafter, Izquierdo approached him, looking "very upset" and "crying that [Montgomery] was telling her he going to do all nasty things [sic]."[8] (Docket Nos. 28-3 at 124:16-125:10, 132:6-23; 30 ¶¶ 22-23; 33 ¶¶ 22-23).

Plaintiff told Izquierdo to stay where she was and that he would tell Mayor Simon what happened. (Docket No. 28-3 at 133:6-10). Immediately thereafter, Plaintiff entered Mayor Simon's office and told him that Izquierdo "was insulted sexually" and there was a "problem." (*Id.* at 133:10-134:5). Mayor Simon responded that he would "take care of it."[9] (Docket No. 28-3 at 134:17-18). On his way back to his chair, Plaintiff encountered Anthony Mallia ("Mallia"), Mayor Simon's aide. (*Id.* at 133:25-136:19). Plaintiff told Mallia that "there was sexual

---

[7] Montgomery's mother, Diana Montgomery, was the Village Clerk. (Docket Nos. 28-3 at 67:6-7, 154:15-17; 33 ¶ 20).

[8] In certain portions of Plaintiff's Counterstatement, Plaintiff "disputes any alleged statements by Ms. Izquierdo" on hearsay grounds. (*E.g.*, Docket No. 33 at ¶¶ 31-32). As Izquierdo was not deposed, the evidence of her statements stems from other individuals' deposition testimony. (*See id.*). Thus, the Court agrees that these statements are inadmissible for hearsay purposes, *i.e.*, to prove the truth of the matter of asserted. *See* Fed. R. Evid. 801(c)(2). However, "[s]tatements offered for their effect on the listener, rather than the truth of their contents, are not hearsay." *Guan v. City of New York*, 18-CV-2417 (GBD) (BCM), 2020 WL 6688855, at *3 n.6 (S.D.N.Y. Sept. 18, 2020); *see also Smith v. City of New York*, 388 F. Supp. 2d 179, 182 n.2 (S.D.N.Y. 2005). Therefore, the Court considers these statements to the extent that they reflect the reasons why witnesses from both sides took particular actions in response to Izquierdo's sexual harassment complaint.

[9] Mayor Simon did not specifically recall Plaintiff reporting directly to him any sexual harassment concerning Izquierdo. (Docket No. 28-5 at 57:20-58:3). Rather, Mayor Simon testified that on the date of the incident, Plaintiff asked to speak with him, and when Mayor Simon left his office to find Plaintiff, he observed Plaintiff "at the other end of the hall" with "counsel" and a man holding a gun. (*Id.* at 58:7-25). Mayor Simon learned of the complaint "later" when "counsel" told him "what was going on." (*Id.* at 59:4-5). In any event, a deponent's failure to remember a particular event is insufficient to create a genuine issue of fact for summary judgment purposes. *See Johnson v. City of New York*, No. 18-CV-6256 (RA), 2020 WL 2732068, at *4 (S.D.N.Y. May 26, 2020).

harassment;" that Izquierdo was "crying" and "hysterical;" and that he had reported the incident to Mayor Simon. (*Id.* at 137:6-14). Plaintiff simultaneously observed Reyes, who was also on security duty that day, speaking with Izquierdo. (*Id.* at 125:25-130:19, 135:25-136:4, 138:5-11). Mallia then instructed Izquierdo to go to the Village Attorney's office.[10] (Docket No. 28-3 at 138:15-139:22).

In light of Izquierdo's distress, Plaintiff accompanied her to the Village Attorney's office. (*See id.* at 140:7-18). In the interim, Anthony Brigandi ("Brigandi"), a Village attorney, learned of the incident and reported it to Nallia Booth ("Booth"), head of the Section 8 Office. (Docket No. 28-4 at 66:6-24). According to Brigandi, he then assembled an in-person meeting in his office with Booth, Mallia, Izquierdo and Plaintiff. (*Id.* at 66:17-67:15). Brigandi asked Izquierdo what happened. (*Id.* at 67:16-19). Izquierdo explained that "certain jokes" had "cross[ed] a . . . line" but declined to make a formal complaint against any specific person. (*Id.* at 67:20-68:10).

That same day, Brigandi interviewed Montgomery with Booth and Mallia present. (*Id.* at 69:11-70:2). An hour or two later, he conducted a further meeting with Booth, Mallia, Plaintiff, Izquierdo, and also Izquierdo's father, Nelson Izquierdo.[11] (Docket No. 28-4 at 71:13-72:24). Izquierdo then submitted a written complaint. (*Id.* at 70:23-73:12). Based on the written complaint, Brigandi, Booth and Mallia interviewed Montgomery a second time. (*Id.* at 75:2-22). According to Brigandi, after an investigation, the Village suspended Montgomery without pay and required him to take sexual harassment training. (*Id.* at 79:16-80:25).

---

[10] Plaintiff argues that Mallia's statements are inadmissible hearsay. (Docket No. 33 ¶ 28). However, this particular statement is not hearsay because it is a command and not offered to prove the truth of the matter asserted. *See Cameron v. New York City Dep't of Educ.*, 15-CV-9900 (KMW), 2018 WL 1027710, at *5 (S.D.N.Y. Feb. 21, 2018); *see also* Fed. R. Evid. 801(c)(2).

[11] Plaintiff could only recall one meeting, and testified that D'Alisera was also there. (Docket No. 28-3 at 141:11-17, 143:17-144:3). Nelson Izquierdo is a retired police officer. (*Id.* at 144:10-11).

**C.  Complaints Regarding the Security Role**

**1.  Civil Service Law and Rule Violations**

RCDP annually audits municipalities' payrolls to ensure compliance with the Civil Service Law. (Docket Nos. 30 ¶ 50; 33 ¶ 50).  The audit typically takes place in June and requires that municipalities submit their payroll information in advance so that RCDP can compare them with their civil service records. (*See* Docket Nos. 28-4 at 28:13-17; 28-7 at 8:16-9:2).

Brigandi testified that in 2018, the Village submitted its payroll in December even though it was due in June because the Deputy Clerk, Nelli Villegas ("Villegas") and then Joseph Chabot ("Chabot"),[12] was not "comfortable with a number of different issues that were coming up" and needed extra time to "resolve them." (Docket No. 28-4 at 25:21-26:16, 27:23-28:12).  The record does not indicate when exactly the Village raised these issues with RCDP.  However, it is clear that Villegas became concerned about the issues in June, which prompted her to delay the submission, and that the Village discussed them with RCDP via a phone call as early as November or December 2018. (*Id.* at 25:21-26:16, 27:23-28:12, 30:7-31:10).  These conversations culminated in an in-person meeting "at the end of 2018" through which the Village obtained an extension to provide the payroll by the end of the year, and several additional calls and e-mails discussing the payroll's various discrepancies. (*See id.* at 26:11-28:22; *see also id.* at 39:8-23).  Brigandi could not recall whether any of these communications specifically mentioned Plaintiff. (*Id.* at 39:20-40:2).  However, he and Chabot "understood" that the Village "would most likely be denied certification." (*Id.* at 29:13-21).

---

[12] Villegas acted as Deputy Clerk "between September and October to maybe the middle of November" 2018, and Chabot acted as Deputy Clerk thereafter. (Docket No. 28-4 at 28:23-29:5).

According to a letter dated January 18, 2019 from Lori Gruebel of RCDP ("Gruebel") to Mayor Simon (the "January 2019 Letter"), the Village attempted to submit its 2018 payroll on December 21, 2018, January 4, 2019, and January 17, 2019. (Docket No. 32-6 at 2). However, as of January 18, 2019, the payroll was still "overdue" because the most recent submission was incomplete and did not comply with the Civil Service Law. (*Id.*). According to the January 2019 Letter, RCDP had "[n]umerous phone conversations, meetings, trainings and emails" with Defendant's payroll team to advise them on compliance. (*Id.*). The letter attached a discrepancy report "disapprov[ing]" certain employees' hours or titles. (*Id.* at 4-17). The report identified Reyes and Mallia, but not Plaintiff. (*Id.* at 4, 13-14). The report stated that Reyes was not "[c]ertified to work part-time hours," and Mallia was "[n]ot certified during payroll period and to date." (*Id.* at 4). Based on these and other discrepancies, RCDP "refuse[d] to certify" the Village's payroll, and required the Village to (a) provide written proof by February 18, 2019 that the discrepancies were resolved; as well as (b) submit its payroll on a monthly basis until further notice. (*Id.* at 3).

Correspondence over the next several weeks indicates that RCDP and Defendant discussed these issues further in a meeting on February 7, 2019, and confirmed that: (a) Mallia was terminated; (b) Reyes would only "work[] part time hours;" and (c) Defendant had notified "all part-time employees . . . that they cannot work more than the permitted hours." (Docket Nos. 32-9 at 2, 4-6; 32-12). These communications do not specifically mention Plaintiff.

In a further letter dated February 28, 2019 (the "February 2019 Letter"), RCDC advised the Village that after receiving another inadequate payroll on February 22 (the "February 2019 Payroll"), and despite further discussions with the Village, RCDC refused to certify that payroll as well as the June 2018 payroll. (Docket No. 32-7 at 2-3). According to the letter, the most

recent payroll contained many of the same discrepancies noted in the January 2019 Letter, as well as "a significant number of new discrepancies." (*Id.* at 3).  The letter again attached a discrepancy report, this time listing Plaintiff as "[c]ertified as Court Attendant (PT) working Part Time Hours, not as Court Attendant PT working 93.99 hours bi-weekly" for the February 4 through February 17, 2019 payroll period.[13] (Docket No. 32-7 at 6).  The discrepancy report noted the same problem with Reyes. (*Id.*).  The letter concluded that RCDP had "hereby exhausted [its] administrative remedies in attempting to correct the Village's continuing violations of the Civil Service Laws and Rules," and would "refer[] this matter to the Rockland County District Attorney and the Rockland County Attorney."[14] (Docket No. 32-7 at 3). Fortunado drafted the letter, and testified that it was "the culmination of an initial notice that [RCDP] couldn't certify" Defendant's payroll as well as further "attempts to try to get them . . . into compliance." (Docket No. 28-7 at 6:20-7:5, 31:19-33:25).

Further e-mails from March 2019 indicate that Defendant continued to face payroll problems over the next month, but none expressly relating to Plaintiff or part-time employees continuing to work for too many hours. (Docket Nos. 32-10; 32-13).

---

[13] Plaintiff correctly notes that these hours are inconsistent with Plaintiff's hours as reflected in the time cards provided by Defendant. (Docket No. 33 ¶ 59).  Indeed, the time cards state that the most Plaintiff worked biweekly before the Security Role's discontinuance was 19.5 hours. (Docket No. 32-5 at 2).  Furthermore, the role was eliminated, leaving Plaintiff working solely as a court officer, long before the release of the February 2019 Payroll. (Docket No. 33 ¶ 59).

[14] The February 2019 Letter also noted that RCDP received "an abusive and disrespectful letter" from Mayor Simon on January 28, 2019, to which RCDP responded on February 1, 2019. (Docket No. 32-7 at 2).  However, this correspondence is not in the record.  Jeffrey Fortunado ("Fortunado"), the former Personnel Administrator and Assistant County Attorney for RCDP, testified that as a general matter, Mayor Simon was "always difficult" and "could be insistent that [RCDP] didn't know what [it] w[as] talking about." (Docket No. 28-7 at 57:17-23).

### 2. The D'Alisera Memo

Mayor Simon testified that D'Alisera complained to him "orally" regarding Plaintiff's security work on December 10 or 11, 2018.[15] (Docket No. 28-5 at 41:22-42:22).  Mayor Simon instructed D'Alisera to reduce his complaint to writing, (*id.* at 42:7-22), and on December 11, 2018, D'Alisera submitted a memorandum expressing "concerns of village Court Attendants [sic] working as security in the village hall during normal business hours" (the "D'Alisera Memo"), (Docket No. 28-8).  Citing N.Y. Crim. Proc. Law § 2.10, D'Alisera explained that such court attendants "only have power in their geographical area of employment." (*Id.*); *see also* N.Y. C.P.L. § 2.10(66).[16]  Moreover, if Mayor Simon wished to use court attendants for this purpose, it would be more appropriate to designate them as "Security Guard[s]," which would require the Village and union to formally create this title as well as obtain approval by the Board and RCDP.[17] (Docket No. 28-8).

### 3. Union Grievances

According to Defendant, in late 2018, Robert Nesi ("Nesi"), another Village Court officer, filed a union grievance alleging that the Village had improperly assigned extra security hours to the other court officers without offering them to more senior court officers first. (Docket Nos. 28-4 at 48:6-49:11; 30 ¶ 38).  After this grievance was denied, Nesi and Reyes filed a

---

[15] Although Plaintiff argues that D'Alisera's statements as recalled by Mayor Simon constitute hearsay, (Docket No. 33 ¶ 60), the Court considers them for purposes of understanding their effect on the Village's actions with respect to the Security Role. *See* Fed. R. Evid. 801(c)(2); *supra* n.8.

[16] N.Y. Crim. Proc. Law § 2.10 provides, in relevant part, that "[n]otwithstanding the provisions of any general, special or local law or charter to the contrary, only the following persons shall have the powers of, and shall be peace officers: . . . (66) [e]mployees of the village court of the village of Spring Valley serving as security officers at such village court." N.Y. C.P.L. § 2.10(66).

[17] Indeed, Fortunado testified that pursuant to Civil Service Law, to create a new position, municipalities must submit the position to RCDP so that RCDP can classify it, determine its minimum qualifications, and draft a position description outlining the duties and responsibilities associated therewith. (Docket No. 28-7 at 10:18-13:6). The purpose of this rule is to ensure that the "taxpayer money" allocated to each municipal job "corresponds for [sic] the job being performed" and the work for which employees are tested. (*Id.* at 15:9-16:10).

further grievance wherein Reyes argued that he was entitled to "more hours" than Plaintiff in light of his seniority.[18] (Docket No. 28-4 at 51:19-53:3).

However, an Arbitration Opinion & Award dated October 3, 2019 (the "Award") describes the grievances differently. (Docket No. 32-8).  According to the Award, Reyes and Nesi argued that until August 2018, their shifts were assigned based on seniority, with Reyes, the most senior court officer, selecting his shifts first, followed by Plaintiff, the second-most senior court officer, and then Nesi. (*Id.* at 5-6).  However, after the Village hired additional court officers, shift assignments were offered "without regard to seniority," resulting in "a notable decrease in [the grievants'] . . . monthly work assignments." (*Id.* at 6).  The grievance was filed on or about September 4, 2018. (*Id.*).  The Award is silent about Plaintiff and Reyes's security duties in Village Hall.

**D.  Elimination of the Security Role**

The Security Role was eliminated on or about December 11, 2018. (Docket Nos. 1 ¶ 32; 33 ¶ 74).  Mayor Simon testified that when he received the D'Alisera Memo, he "immediately handed it over to" his counsel, and counsel "directed" him "[t]o discontinue [Plaintiff's security attendant] position."[19] (Docket No. 28-5 at 44:2-17).  According to Brigandi, after receiving the D'Alisera Memo, Defendant "decided" that Plaintiff's "security attendant position function was invalid," and instructed Brigandi to inform all court attendants performing this work "that they were just to perform their Justice Court attendant function." (Docket No. 28-4 at 54:19-55:7).  Brigandi informed Reyes of this decision in-person. (Docket No. 28-4 at 55:8-11).  Reyes in turn

---

[18] Although Brigandi testified that these grievances and any determinations thereof were made in writing, (Docket No. 28-4 at 50:20-51:12), Defendant did not produce any documents related to them, (Docket No. 33 ¶ 38).

[19] Contrary to Plaintiff's assertions, (Docket No. 33 ¶ 72), Village counsel's statements are admissible for the purpose of explaining Mayor Simon's reasons for ending Plaintiff's security position. *See* Fed. R. Evid. 801(c)(2); *supra* n.8, 15.

told Plaintiff.[20] (Docket No. 28-4 at 55:8-11).  Thereafter, Brigandi spoke by phone to Plaintiff

about the decision. (*Id.* at 55:8-14; *see also* Docket No. 28-3 at 77:15-25, 157:15-158:12).

Brigandi testified that during the call, he told Plaintiff that "no one is being fired, you are just

doing your Justice Court attendant position," and "if you have an issue you have to address it

with your union." (Docket No. 28-4 at 55:15-56:3).

Mayor Simon testified that the Security Role was eliminated due to (1) "communications

from county personnel which said that [Plaintiff] was working too many hours as he was part-

time;" and (2) the D'Alisera Memo. (Docket No. 28-5 at 47:24-48:9; [21] *see also* Docket Nos. 28-

4 at 48:2-13).  However, Plaintiff testified that when he called Brigandi "a couple of days" after

he heard the news of his removal from Reyes, Brigandi could not provide a "straight answer"

about why the role was discontinued. (Docket No. 28-3 at 78:2-8, 81:9-19).  Plaintiff also claims

that he, Reyes and Mallia were the only three employees whose roles were discontinued due to

certification issues out of "numerous" others listed as "disapproved" for the same reason in

RCDP's correspondence. (Docket No. 33 ¶ 58; *see also* Docket Nos. 32-6; 32-7; 32-11 at 7).  As

a result of the elimination of the Security Role, Plaintiff was no longer entitled to health benefits,

---

[20] Reyes' statement to Plaintiff —conveying Brigandi's instructions regarding the Security Role—must be evaluated as potential double hearsay because it contains two out-of-court statements, from Brigandi to Reyes, and Reyes to Plaintiff. *See generally United States v. Cummings*, 858 F.3d 763, 773 (2d Cir. 2017).  However, it is not hearsay because (1) Brigandi's instructions constitute a command; and (2) Reyes' repetition of these instructions is admissible for its effect on Plaintiff's next course of action. *See* Fed. R. Evid. 801(c)(2); *supra* n.8, 10, 15, 19.  Thus, although the statement contains two levels of out-of-court communications, the Court rejects Plaintiff's argument that it is inadmissible. (Docket No. 33 ¶ 74).

[21] Plaintiff asks the Court to disregard the entirety of Mayor Simon's testimony because, through this statement, "he testified falsely regarding an important material fact in this matter—the actual reason for Plaintiff's removal from this position." (Docket No. 31 at 20-21).  Under the doctrine of *falsus in uno*, a factfinder may reject the entirety of a witness's testimony if he "find[s] that [the] witness wilfully falsely testified to a material fact." *United States v. Foster*, 9 F.R.D. 367, 389 (S.D.N.Y. 1949); *see also Hernandez v. NJK Contractors, Inc.*, No. 09-CV-4812 (RER), 2015 WL 1966355, at *31 (E.D.N.Y. May 1, 2015).  The Court declines to apply this doctrine because the subject testimony is not necessarily inconsistent with undisputed evidence that Defendant anticipated payroll problems at the end of 2018, and RCDP advised Defendant numerous times that employees in Plaintiff's position could not work more than part-time hours. (Docket Nos. 28-4 at 29:13-21; 28-5 at 46:12-47:7; 28-7 at 31:19-33:25; 32-6).

and lost the ability to work more than part-time hours. (*See* Docket No. 33 ¶ 74; *see also* Docket Nos. 28-3 at 112:21-24; 32-5).

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, the moving party bears the burden of demonstrating that it is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005).  The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute as to a material fact "exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986).  "A fact is material if it might affect the outcome of the suit under the governing law." *Casalino v. N.Y. State Catholic Health Plan, Inc.*, No. 09 Civ. 2583(LAP), 2012 WL 1079943, at *6 (S.D.N.Y. Mar. 30, 2012) (internal quotation marks omitted).

In reviewing a motion for summary judgment, the Court "must draw all reasonable inferences in favor of the [non-moving] party" and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).  That said, the Court may not weigh the evidence or determine the truth of the matter, but rather conducts "the threshold inquiry of determining whether there is the need for a trial[.]" *Anderson*, 477 U.S. at 250.

The moving party bears the initial burden of "demonstrating the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323).  If the moving party meets this initial burden, the burden then shifts to the non-

moving party to "present evidence sufficient to satisfy every element of the claim." *Id.* "The non-moving party is required to 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial,'" *id.* (citing *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 249–50), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the non-moving party fails to establish the existence of an essential element of the case on which it bears the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## III.  DISCUSSION

Plaintiff alleges that Defendant retaliated against him for complaining of sexual harassment in violation of 42 U.S.C. § 2000(e). (Docket Nos. 1 ¶¶ 38-41; 31 at 7). Defendant argues that this claim fails as a matter of law because (1) the discontinuance of the Security Role does not constitute an adverse employment action; and (2) Plaintiff fails to show a causal connection between his complaint and the role's discontinuance. (Docket No. 29 at 7, 13-17). For the reasons that follow, the Court agrees with Defendant.

## A.  Retaliation in Violation of Title VII

Title VII of the Civil Rights Act of 1964 forbids discrimination against an employee "because [s]he has opposed any practice made an unlawful employment practice . . . or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the auspices of that statute]." 42 U.S.C. § 2000e-3(a). Retaliation claims under Title VII are analyzed under the same burden-shifting framework as discrimination claims. *See Sumner v. U.S. Postal Service*, 899 F.2d 203, 208–209 (2d Cir. 1990). To make out a *prima facie* case of retaliation under Title VII, a plaintiff must show that "[s]he engaged in

protected participation or opposition under Title VII, that the employer was aware of this

activity, that the employer took adverse action against the plaintiff, and that a causal connection

exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played

a part in the adverse employment action." *Id*.  Proof of causation, the final element of a *prima*

*facie* retaliation claim, "can be shown either '(1) indirectly, by showing that the protected

activity was followed closely by discriminatory treatment, or through other circumstantial

evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2)

directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'"

*Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015) (quoting *Gordon v. N.Y.C. Bd.*

*of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

Once the plaintiff puts forth a *prima facie* case, the burden shifts to the defendant to

articulate a non-retaliatory reason for the adverse employment action. *See Ya-Chen Chen v. City*

*Univ. of New York*, 805 F.3d 59, 70 (2d Cir. 2015).  "If the defendant provides such an

explanation, the presumption of retaliation dissipates, and the plaintiff must prove that the desire

to retaliate was the but-for cause of the challenged employment action." *Id.* (quoting *Univ. of*

*Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013); *Jute v. Hamilton Sundstrand Corp.*,

420 F.3d 166, 173 (2d Cir. 2005)) (internal quotations omitted).

**1.  *Prima Facie* Case of Retaliation**

Defendant argues that Plaintiff cannot make a *prima facie* case of retaliation because his

assignment to the Security Role violated New York law, and thus, its discontinuance does not

constitute an adverse employment action. (Docket No. 29 at 6-13).  According to Plaintiff, this

argument relies on the incorrect premise that an employee's qualifications are relevant to

retaliation claims. (Docket No. 31 at 14-15).  Plaintiff further asserts that the Security Role's

elimination qualifies as an adverse employment action because it resulted in a reduction in wages

and benefits. (*Id.* at 14).  Defendant maintains that under *Orlando v. Department of Transportation, Commissioner*, 459 F. App'x 8 (2d Cir. 2012) (summary order), an employee's qualifications are relevant to this element of a *prima facie* retaliation case. (Docket No. 36 at 3). The Court agrees that because Plaintiff was not legally entitled to perform the Security Role in the first place, he did not suffer an adverse employment action.

"An adverse employment action is a materially adverse change in the terms and conditions of employment . . . [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Fairbrother v. Morrison*, 412 F.3d 39, 56 (2d Cir. 2005), *abrogated on other grounds by Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199 (2d Cir. 2006) (quoting *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004); *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)) (internal quotations omitted).  To prevail on this prong, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotations omitted).  This standard is "broader" than that of Title VII discrimination claims. *See Anderson v. Nassau Cty. Dep't of Corr.*, 558 F. Supp. 2d 283, 301 (E.D.N.Y. 2008).  Nonetheless, the standard set forth in *Burlington* only permits recovery for "significant" harm; "petty slights or minor annoyances that often take place at work and that all employees experience" do not trigger liability. *See* 548 U.S. at 68.

The determination whether the challenged action meets this standard is fact-specific, "depend[ing] upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."

15

*See id.* at 71 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)) (internal quotations omitted).  Because the determination is "objective," it need not inquire into the "plaintiff's unusual subjective feelings." *See id.* at 68–69.  "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (quoting *Fairbrother*, 412 F.3d at 56) (internal quotations omitted).

Defendant argues that "[n]o objectively reasonable person would find" the role's discontinuance adverse because Plaintiff's assignment to the Security Role improperly bypassed various laws governing (1) civil service appointments; and (2) payroll certification. (Docket No. 29 at 8-13).  With regard to the appointment process, Article V, Section 6 of the New York State Constitution requires that civil service appointments "be made according to merit and fitness to be ascertained, as far as practicable, by examination which, as far as practicable, shall be competitive." *See* N.Y. Const. art. V, § 6.  Pursuant to the Civil Service Law, open competitive examinations must be held for "all positions for which it is practicable to determine . . . merit and fitness." N.Y. Civ. Serv. Law § 44.  Moreover, in any instance where a competitive examination is deemed impracticable, civil service appointments may be made only "after such non-competitive examination as is prescribed by the state civil service department or municipal commission having jurisdiction." *Id.* § 42(1).  To effectuate these requirements, the Rockland County Civil Service Rules[22] mandate that to create a civil service position, the "appointing authority" provide RCDP a "detailed description" of the position's "duties and responsibilities"

---

[22] N.Y. Civil Service Law § 15(1)(b) affords county departments of personnel "the general power of appointment of city officers and employees." N.Y. Civ. Serv. Law § 15(1)(b).

as well as "minimum" qualifications, which RCDP must use to "classify" the position or "create a new class" to which the position is assigned. *See* Rockland County Civil Service Rule XXIII(4) (2017).

According to Defendant, Plaintiff's assignment to the Security Role violated these rules because his new duties went beyond the scope of his court officer responsibilities, and the new position was never submitted to RCDP for classification. (Docket No. 29 at 8).  Moreover, Plaintiff's assignment was unconstitutional "since he had not yet taken and passed [any] examinations prescribed for th[e] [new] position at the time of his initial appointment." *See Montero v. Lum*, 68 N.Y.2d 253, 259 (1986) (deeming permanent appointment to youth aide position invalid because plaintiff had not yet taken and passed requisite civil service examination); *see also Niebling v. Wagner*, 239 N.Y.S.2d 537, 541 (1963) (holding that petitioners were illegally promoted where "the department simply gave the petitioners the new title of assistant park director, arbitrarily equating it with that of supervisor, and thereby enabled the petitioners to continue obtaining the benefits of higher salary and higher position without taking a competitive examination"); (Docket No. 29 at 10-11).  Because Plaintiff was never entitled to perform the new role, Defendant reasons, its discontinuance does not constitute an adverse employment action under Title VII. (Docket Nos. 29 at 10-11; 36 at 3).

Defendant further argues that Plaintiff's assignment was illegal because his increased hours, salary and responsibilities were never certified by RCDP. (Docket No. 29 at 11).  Indeed, N.Y. Civ. Serv. Law § 100 requires that the legality of all salaries and employment for civil service positions be certified by "the civil service department . . . having jurisdiction." *See* N.Y. Civ. Serv. Law § 100(1)(a).  Rule XXII(3) of the Rockland County Civil Service Rules provides that "[u]pon satisfactory evidence of intention to evade the provisions of the law and/or of these

Rules in assigning any employee to perform duties other than those for which he/she was examined and certified under any title not appropriate to the duties to be performed, the Commissioner of Personnel shall refuse certification or terminate a certification previously made and then in force." Rockland County Civil Service Rule XXII(3).  Moreover, it is a misdemeanor to compensate "any person in the classified service with knowledge that" such certification has been refused, or when on notice that "such person['s]" duties or assignments violate the Civil Service Law. *See* N.Y. Civil Serv. Law § 101.  Citing RCDP's refusals to certify the payroll and Plaintiff's increased hours, Defendant contends that Plaintiff's assignment to the Security Role constituted an "improper use of public funds" and exposed Mayor Simon to criminal liability for a misdemeanor. (Docket No. 29 at 8, 11-13).

There does not appear to be any case within the Second Circuit or elsewhere that has formally analyzed whether elimination of an illegally-created position constitutes an adverse employment action for purposes of retaliation under Title VII.  However, there is no dispute that Plaintiff's assignment posed serious legal issues under the New York Constitution and Civil Service Law.  Indeed, Defendant never submitted the new Security Role to RCDP for classification, and as a result, Plaintiff never had to take an examination or otherwise demonstrate his qualifications for the job.  Mayor Simon even testified that he did not attempt to formally create a security position "within Village Hall" because "the qualifications for that were things that [Plaintiff] couldn't meet." (Docket No. 28-5 at 15:20-16:9).  Moreover, Plaintiff was never lawfully permitted to work more than the hours allotted for his court officer position, and everyone involved—including Plaintiff—knew that the court officer position was strictly part-time. (*See, e.g.*, Docket Nos. 28-3 at 30:4-31:7; 28-5 at 30:15-21).  Plaintiff essentially seeks

relief for lost benefits and hours that he improperly obtained through his friendship with Mayor

Simon—rather than through merit, as is constitutionally required in New York.

The Court is persuaded that under these circumstances, the discontinuance of Plaintiff's

improperly-created Security Role cannot constitute a materially adverse employment action. *See*

*Burlington*, 548 U.S. at 68.  Because the law plainly requires that civil service employees like

Plaintiff demonstrate specific qualifications for their titles, and Plaintiff never did so, the

elimination of this new role was not adverse. *See id.*  The Second Circuit—albeit via non-binding

summary orders[23]—has twice expressed the view that an employee's failure to pass a qualifying

exam precludes a finding that he suffered an adverse employment action under Title VII and

similar statutes.  Indeed, in *Pena-Barrero v. City of New York*, the Second Circuit rejected both

discrimination and retaliation claims under the Civil Rights Act and Family and Medical Leave

Act ("FMLA"),[24] where the plaintiff declined to take a civil service examination that was

required to continue his position once his agency established a list of eligible candidates. *See* 726

F. App'x 31 (2d Cir. 2012).  Analyzing the discrimination and retaliation claims together, the

Second Circuit found that the plaintiff failed to demonstrate that he was qualified for the

position, and thus, his termination did not constitute a "retaliatory adverse action." *See id.* at 35–

36.

---

[23] "[C]ourts in the Second Circuit have often noted that unpublished opinions and Summary Orders from the Second Circuit Court of Appeals, while not binding, can be instructive to district courts in resolving particular disputes, and also may be seen as highly persuasive and predictive of how the Second Circuit Court of Appeals would decide an issue in the future." *Liana Carrier Ltd. v. Pure Biofuels Corp.*, 14-cv-3406 (VM), 2015 WL 10793422, at *4 (S.D.N.Y. Aug. 14, 2015), *aff'd*, 672 F. App'x 85 (2d Cir. 2016); *see also M. Ali Constr., Inc. v. United Specialty Ins. Co.*, 19-CV-4514 (NGG) (CLP), 2020 WL 3316019, at *4 (E.D.N.Y. June 18, 2020).

[24] "FMLA retaliation claims are analyzed under the same *McDonnell Douglas* standards as Title VII retaliation claims." *Dressler v. New York City Dep't of Educ.*, No. 10 Civ. 3769(JPO), 2012 WL 1038600, at *15 (S.D.N.Y. Mar. 29, 2012) (citing *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004)).

The Second Circuit endorsed similar logic in *Orlando v. Department of Transportation, Commissioner*, wherein the plaintiff could not recover on a discrimination or retaliation theory under Title VII because he failed the requisite test for a promotion. *See* 459 F. App'x at 9.  The Circuit held that because the plaintiff failed the promotional exam, "he was not qualified for the position," which, in turn, precluded a finding that he suffered an adverse employment action for purposes of both causes of action. *See id.*  Although Plaintiff argues that qualification for a position is not relevant to retaliation claims since it is not an element thereof, (Docket No. 31 at 15), these two decisions suggest otherwise, at least where, as here, the alleged retaliation involves discontinuance of a position with specific qualifications or an application process imposed by law. *Cf. McWhite v. New York City Hous. Auth.*, No. 05 CV 0991(NG)(LB), 2008 WL 1699446, at *12 (E.D.N.Y. Apr. 10, 2008) (rejecting retaliation claim because "plaintiff never applied" for one position, and another position "was eliminated shortly after being posted").

Furthermore, under analogous circumstances, federal courts have dismissed Title VII retaliation claims based on lost hours or benefits to which the plaintiff was never entitled under the terms of his or her employment.  For example, courts have found that employees hired to work a specific number of hours, but who habitually worked more, cannot recover based on a change back to the originally agreed-upon amount of work. *See, e.g.*, *Hill v. Potter*, 625 F.3d 998, 1003 (7th Cir. 2010) (finding that "the reduction of [the plaintiff's] hours" was not adverse because "she was not entitled to a 40–hour work week" and never applied to work overtime above the hours to which she was entitled to work); *Williams v. Potter*, Civil No. PJM 09-1009, 2010 WL 1245835, at *3 (D. Md. Mar. 25, 2010) (holding that reduction in hours, which allegedly caused the plaintiff to lose certain benefits and pay, did not constitute adverse

20

employment action because she "was entitled to only four hours of work per day").  Moreover, the absence of pay, benefits or severance does not constitute an adverse employment action where it is undisputed that the plaintiff was not entitled to such benefits or otherwise did not meet the employer's conditions for these allowances. *See Spaulding v. New York City Dep't of Educ.*, No. 12 Civ. 3041 (KAM) (VMS), 2015 WL 12645530, at *44 (E.D.N.Y. Feb. 19, 2015), *report and recommendation adopted*, 2015 WL 5560286 (E.D.N.Y. Sept. 21, 2015) (finding that denial of health benefits was not materially adverse because plaintiff "ha[d] not demonstrated that she was entitled to [them] after she failed to return to work and voluntarily withdrew her medical arbitration request"); *Russo v. Estée Lauder Corp.*, 856 F. Supp. 2d 437, 464–65 (E.D.N.Y. 2012) (granting summary judgment on plaintiff's retaliation claim based on denial of disability benefits where he was not actively working for the company on his date of disability); *Jackson v. Lyons Falls Pulp & Paper, Inc.*, 865 F. Supp. 87, 95 (N.D.N.Y. 1994) (finding no retaliation claim based on refusal to grant benefits and severance absent plaintiff's signature on separation agreement).

It is clear from the record that Mayor Simon created this additional role, in large part, because of his friendship with Plaintiff.  Plaintiff was only certified for the court officer position at a maximum of seventeen-and-a-half hours per week.  He did not interview, take a test, or otherwise apply for the Security Role.  Thus, Plaintiff could not reasonably expect to receive pay or benefits for work he simply was not certified or necessarily qualified to do. *See Burlington*, 548 U.S. at 68; *cf. McNutt v. Nasca*, No. 1:10-cv-1301 (MAD/RFT), 2013 WL 209469, at *20 (N.D.N.Y. Jan. 17, 2013) (finding no adverse employment action based on "what can only be deemed an extracurricular activity"); *Porter v. Donahoe*, 962 F. Supp. 2d 491, 499–500 (E.D.N.Y. 2013) (granting summary judgment where plaintiff "received insurance coverage to

21

which he was not entitled and had to expect to pay for it").  Plaintiff's friendship with the Mayor certainly did not give him the right to benefits or pay for additional hours on assignments beyond the scope of his court officer duties—regardless of Plaintiff's subjective impressions. *See Burlington*, 548 U.S. at 68–69.  Consequently, Plaintiff fails to raise any dispute of material fact regarding whether a reasonable employee in his position would have found the role's elimination materially adverse. *See id.*

        Accordingly, Defendant's motion for summary judgment is granted.

## 2.  The Village's Non-Discriminatory Reason for the Security Role's Elimination and Evidence of Pretext

        Even assuming, *arguendo*, that Plaintiff could make out a *prima facie* case of retaliation, the Court finds that Defendant has nonetheless articulated a legitimate, nondiscriminatory reason for the Security Role's discontinuance, and Plaintiff has not shown that Defendant's proffered reason for this action was mere pretext.  According to Defendant, the additional role was eliminated because of the above illegalities, which were brought to its attention via D'Alisera's complaint and ongoing conversations with RCDP in connection with Defendant's payroll submission.[25] (Docket No. 36 at 6-9).  Plaintiff responds that these reasons were pretextual, in

---

[25] Although Defendant's initial submissions also listed the union grievances as a reason for the role's discontinuance, (Docket Nos. 29 at 5; 30 ¶ 77), Mayor Simon clearly testified that he took this action because of the D'Alisera Memo and RCDP's refusal to certify the payroll when Plaintiff was working too many hours, (Docket No. 28-5 at 47:24-48:9).  Moreover, although the grievances were not specifically related to these legal issues, they flagged the arbitrary manner in which court officers were offered work, which goes to the heart of RCDP and the union's concerns that Plaintiff was permitted extra hours when other court officers were not.  Thus, the grievances are not so inconsistent with the rest of Defendant's proffered reasons as to create a triable issue of fact sufficient to defeat summary judgment. *See Harrow v. St. Luke's Cornwall Hosp.*, 09-CV-7847 (CS), 2011 WL 13383216, at *5 (S.D.N.Y. Mar. 29, 2011), *aff'd*, 485 F. App'x 488 (2d Cir. 2012) (holding that "[t]o whatever extent [supervisor]'s and Defendant's statements may differ," such "shifting justifications" were insufficient to create a genuine issue of fact) (quoting *Hodges v. Rensselaer Hartford Grad. Ctr., Inc.*, No. 3:06-0850 (PCD), 2008 WL 793594, at *9 (D. Conn. Mar. 20, 2008)) (internal quotations omitted); *McDowell v. T-Mobile USA, Inc.*, Civil Action No. CV-04-2909 (DGT), 2007 WL 2816194, at *16 (E.D.N.Y. Sept. 26, 2007), *aff'd*, 307 F. App'x 531 (2d Cir. 2009) (finding that "[a]lthough defendant's statements to the EEOC d[id] not align perfectly with defendant's proffered reasons," such "discrepancies" were "insufficient to show pretext" in light of "other evidence" in the record).

light of the close temporal proximity between his sexual harassment complaint and the role's

elimination as well as (1) inconsistencies in Defendant's explanation; and (2) the fact that

similarly situated employees were not removed from their positions. (Docket No. 31 at 16-25).

"Plaintiff's burden at this stage is to proffer admissible evidence from which a rational

trier of fact could conclude that retaliation was more likely than not the true motivation of

defendant's acts." *Forest v. New York State Office of Mental Health*, No. 13 Civ. 1762 (KBF),

2015 WL 6965149, at *10 (S.D.N.Y. Nov. 10, 2015).  "A discrimination claimant may show

pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could rationally find them unworthy of credence and hence infer that the employer did

not act for the asserted non-discriminatory reasons." *Singer v. New York City Health & Hosps.*

*Corp.*, 18-CV-6356 (BMC), 2020 WL 2933670, at *4 (E.D.N.Y. June 2, 2020) (quoting *Brierly*

*v. Deer Park Union Free Sch. Dist.*, 359 F. Supp. 2d 275, 291 (E.D.N.Y. 2005)) (internal

quotations omitted).  Although temporal proximity between the protected activity and challenged

action "alone is insufficient to show pretext," *Mooney v. City of New York*, No. 18-CV-

328(DLC), 2019 WL 4392961, at *8 (S.D.N.Y. Sept. 13, 2019), "a plaintiff may" succeed on

summary judgment by "rely[ing] on evidence [of] . . . temporal proximity, together with other

evidence such as inconsistent employer explanations." *See Zann Kwan v. Andalex Grp. LLC*, 737

F.3d 834, 847 (2d Cir. 2013).

Plaintiff argues that RCDP's complaints regarding the illegalities of the Security Role is

an implausible reason for the role's discontinuance because there is no evidence that RCDP

conveyed these concerns before December 11, 2018. (Docket No. 31 at 19).  Plaintiff contends

that because no written communications explicitly mentioning him were sent until February

2019—months after the role was eliminated—Mayor Simon's testimony that Defendant stopped using Plaintiff in this capacity due to RCDP's complaints must be false. (*Id.* at 20). However, simply because Plaintiff was not mentioned in writing until February 2019 does not negate the uncontroverted evidence that the problem was discussed before the decision was made. Plaintiff's argument ignores Brigandi's undisputed testimony that Defendant and RCDC were in close communication regarding the payroll problems as early as November 2018 through both meetings and phone calls. (Docket No. 28-4 at 28:13-22, 30:7-31:10, 39:8-23). Plaintiff also ignores Fortunado's testimony that the February 2019 Letter represented a "culmination" of a long series of communications attempting to correct the payroll deficiencies listed therein. (Docket No. 28-7 at 33:19-25). The written correspondence comports with this testimony, and indicates that Defendant was on notice that part-time employees like Plaintiff could not work more than part-time hours—and that Defendant was taking steps to fix this—long before the February 2019 Letter was sent. (Docket Nos. 32-6 at 2, 4, 13-14; 32-9 at 2, 4-5, 6; 32-12). Plaintiff has not produced any evidence suggesting that this stated reason for the role's discontinuance was false. Because Defendant's reasoning is not, in fact, inconsistent in this regard, no reasonable juror could find evidence of pretext on this basis. *See Turner v. NYU Hosps. Ctr.*, 784 F. Supp. 2d 266, 277–78 (S.D.N.Y. 2011), *aff'd*, 470 F. App'x 20 (2d Cir. 2012) (finding no issue of material fact regarding pretext where plaintiff "ha[d] not identified an inconsistency").

Furthermore, although Plaintiff notes that the February 2019 Letter incorrectly listed Plaintiff's biweekly hours during the wrong pay period, (Docket No. 31 at 19), that is clearly a typographical error. "Inconsistencies in a defendant's reasons for an adverse action must be 'material' and not 'minor' to raise a triable factual dispute." *Holleman v. Art Crating Inc.*, No. 12

24

Civ. 2719(VMS), 2014 WL 4907732, at *38 (E.D.N.Y. Sept. 30, 2014) (citing *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988)).  Moreover, Plaintiff does not explain why this single error changes the legal analysis. *See id.* at *39 (finding inconsistent terminology immaterial where plaintiff "d[id] not discuss or offer case citations to support her belief that a specific label . . . [wa]s legally relevant"); *Sarmiento v. Queens Coll. CUNY*, 386 F. Supp. 2d 93, 105 (E.D.N.Y.), *aff'd*, 153 F. App'x 21 (2d Cir. 2005) (holding that "a single misstatement in a letter addressing complicated factual and legal issues underlying four separate hiring decisions . . . [wa]s insufficient to establish a viable claim of pretext").  Indeed, there is no dispute that performing the Security Role in addition to Plaintiff's court officer position entailed working more than part-time hours, *i.e.*, above seventeen-and-a-half hours per week.  Therefore, the specific number of hours listed in the February 2019 Letter is immaterial, and does not create an issue of fact sufficient to preclude summary judgment.

    The same is true with regard to the alleged inconsistencies in the D'Alisera Memo. Plaintiff argues that the memo is suspect because D'Alisera was not an attorney, and "there is no indication anywhere in the record that Mayor Simon intended for Plaintiff to be able to arrest anyone in the Village or even act as a 'peace officer' in the first place." (Docket No. 31 at 24). D'Alisera's lack of legal expertise is immaterial in light of the fact that Plaintiff does not dispute any of the memo's legal conclusions, and in light of Mayor Simon's testimony that he discontinued the Security Role based on his own counsel's review of the memo. (Docket No. 28-5 at 44:2-17); *see also Dister*, 859 F.2d at 1116.  Moreover, Plaintiff's suspicions regarding his "peace officer" status miss the point.  Although Defendant notes that as a general matter, loss of "peace officer" status under N.Y. Crim Proc. Law § 2.10 affects the ability to arrest, (Docket No. 30 ¶¶ 63-64), a review of the D'Alisera Memo reveals that the purpose of citing this provision

25

was to highlight the jurisdictional limits of Plaintiff's "powers" as a court officer in Village

Court. (Docket No. 28-8).  This, and the memo's reference to civil service appointments, is

consistent with RCDC's complaints that Plaintiff's hours contravened the narrow scope of

Plaintiff's certification as well as the Civil Service Law's requirements for appointments to new

positions. (*See id.*; *see also supra* Sections I.C.2, III.A.1).  Therefore, these proffered reasons are

"not conflicting, but complementary." *See Warren v. N. Shore Univ. Hosp. at Forest Hills*, Civil

Action No. CV-03-0019 (DGT)(RML), 2006 WL 2844259, at *10 (E.D.N.Y. Sept. 29, 2006);

*see also Harrow*, 2011 WL 13383216, at *5 (granting summary judgment where "the alleged

shifting theories '[we]re thus variations, if that, on the same theme rather than separate

inconsistent justifications'") (quoting *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir.

2001)).

      Plaintiff further contends that Defendant's proffered reasons are not credible due to

Defendant's disparate treatment of Plaintiff compared to similarly situated employees. (Docket

No. 31 at 21).  Plaintiff notes that according to Defendant's interrogatory responses, only Mallia

and Reyes "were terminated or removed from their positions for [sic] Defendant for the same

reason as Plaintiff," even though RCDP identified several employees as improperly working

more than part-time hours, and Defendant's payroll problems persisted until March 2019.

(Docket No. 32-11 ¶ 13; *see also* Docket Nos. 33 ¶ 58; 32-6; 32-7; 32-10; 32-13).  As a general

matter, "[e]vidence that a plaintiff was treated less favorably than similarly situated comparators

outside the plaintiff's protected group can raise a question of fact as to pretext." *Campbell v.

Bottling Grp., LLC*, 814 F. App'x 630, 632 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 2535, 209 L.

Ed. 2d 559 (2021) (summary order).  To suffice, however, such disparate treatment must involve

employees that are similarly situated "in all material respects." *See Graham v. Long Island R.R.*,

230 F.3d 34, 39 (2d Cir. 2000) (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)) (internal quotations omitted).  This determination hinges on whether the other employees were "subject to the same standards governing performance evaluation and discipline, and . . . engaged in conduct similar to the plaintiff's without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it." *Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 256 (S.D.N.Y. 2015) (quoting *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 249 (S.D.N.Y. 2001)) (internal quotations omitted).

Here, even viewing the evidence in Plaintiff's favor, the other employees listed in RCDP's correspondence plainly are not similarly situated "in all material respects." *See Graham*, 230 F.3d at 39.  The record is clear that Plaintiff and Reyes were the only Village Court officers given additional security hours in Village Hall. (Docket No. 28-3 at 60:18-62:12, 70:3-9).  Plaintiff and Reyes both presented legal concerns for Defendant not only because of their extra hours, but because the union specifically complained that they were offered the Security Role on top of their official duties without proper approval. (Docket No. 28-8).  There is no indication that Defendant received similar union complaints regarding this practice with respect to any other employees listed in RCDP's discrepancy reports, for security work or any other function.  Therefore, "there are differentiating and mitigating circumstances that distinguish" the other employees' treatment "from Plaintiff's [situation]." *See Clark*, 96 F. Supp. 3d at 256, 263; *see also Belgrave v. City of New York*, No. 95-CV-1507 (JG), 1999 WL 692034, at *28 (E.D.N.Y. Aug. 31, 1999), *aff'd sub nom. Belgrave v. New York City*, 216 F.3d 1071 (2d Cir. 2000) (finding no evidence of differential treatment where plaintiff's job responsibilities "differed significantly" from other employee's work).  Absent evidence that any other similarly situated employee was both the subject of a union complaint *and* payroll concerns, there is no dispute of material fact

regarding whether Plaintiff's differential treatment from other employees evidences pretext. Consequently, Plaintiff's grounds for pretext rest on temporal proximity alone, which is insufficient to survive summary judgment. *See Mooney*, 2019 WL 4392961, at *8.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted.  The Clerk is respectfully requested to terminate the pending motion (Docket No. 27), and close the case.

Dated: May 6, 2022
         White Plains, New York

**SO ORDERED:**

JUDITH C. McCARTHY
United States Magistrate Judge